Entered on Docket May 17, 2013

Below is the Order of the Court.



*Paul B. Snyder*
_____
**Paul B. Snyder**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

DONALD G. HUBER,

               Debtor.

**Case No. 11-41013**

MARK D. WALDRON, Trustee for the estate of Donald G. Huber,

               Plaintiff,

v.

DONALD G. HUBER, a single man; KEVIN D. HUBER, individually and as Trustee of the DONALD HUBER FAMILY TRUST; ALASKA U.S.A. TRUST COMPANY, as Trustee of the DONALD HUBER FAMILY TRUST; GARY M. DREYER and CONSTANCE M. DREYER, as Trustees of the DREYER FAMILY LIVING TRUST dated May 12, 1999; KIMBALL CENTER, LLC, an Alaska limited liability company; DGH, LLC, an Alaska limited liability company; 8310 LLC, an Alaska limited liability company; 3505 N. Gove, LLC a/k/a 3305 N. Gove, LLC, an Alaska limited liability company; PIONEER PLAZA, LLC, an Alaska limited liability company; PSEA, LLC, an Alaska limited liability company; SURE SEAL, LLC, a Washington limited liability company; and JOHN DOE, entities 1 through 50,

               Defendants.

**Adversary No. 12-04171**

**ORDER GRANTING TRUSTEE PARTIAL SUMMARY JUDGMENT**

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 1

This matter came before the Court on April 15, 2013, on the Motions for Summary Judgment as to Claims Relating to Transfers by Debtor & Invalidity of Trust and as to Claim of Denial of Discharge, filed by Mark D. Waldron, Trustee for the estate of Donald G. Huber (Trustee) against Donald G. Huber (Debtor).  At the conclusion of the hearing, the Court took the matter under advisement.  Based on the arguments and pleadings presented, the order of the Court is as follows:

The Debtor has been involved in real estate development and management in the Puget Sound area for over 40 years.  He graduated from Pacific Lutheran University in Tacoma with a degree in Business Administration and Sociology.  In 1968, he founded United Western Development, Inc. (UWD) with its principal place of business located in Tacoma, Washington. The purpose was to use it as a vehicle to engage in real estate development. The Debtor still serves as its President, although he is partially retired.  The operation of UWD and the Debtor's other businesses is now primarily performed by his eldest son, Kevin D. Huber, who has served as UWD's Senior Vice President – Business Development since 2001.  Kevin Huber received an MBA from the University of Southern California's Marshall School of Business in 1999 and is heavily involved in managing the various Huber-related interests.

In the past, the Debtor's residential development customers were not only the typical home buying public, but large home builders such as Quadrant Homes and Polygon Northwest, which have substantial financial backing. Many, if not all, of the projects of the Debtor were undertaken by him through the use of an entity separate and apart from UWD, such as through a corporation or limited liability company, with the Debtor owning all, or a portion, of the project. The Debtor, however, was required on many projects to sign as guarantor in favor of third party lenders, many of them local banks.  These appear to be the largest creditors of his bankruptcy. In 2002, UWD added additional staff in order to expand its market share and geographic market within the Pacific Northwest.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 2

In 2007, UWD hired an individual who was experienced in investment banking and real estate securitization with a plan to secure additional financing. Subsequently, UWD entered into an engagement letter with Houlihan Lokey, a private finance group, to assist it in raising approximately $55 million in capital. The Private Placement Memorandum was completed in August 2008. The funds were to be used to pay off existing debt, provide additional working capital for present and future needs, and to fund the transaction fees. The cost of the "due diligence" requirements was substantial, but in late September or early October 2008, the Debtor embarked on a fund raising trip to New York City. The Debtor/UWD, however, proved to be unsuccessful in its attempt to secure additional financing, receiving only one verbal offer and no written offers. On October 10, 2008, UWD terminated the agreement with Houlihan Lokey, partly due to the market turmoil that was by then affecting the real estate market nationwide, further dimming their chances of securing additional funding.

In 2007, the Debtor had and was in partnership on many of his projects with Robert Terhune, who was also a guarantor of many of the same projects. In a series of emails entered into the record as exhibits between the Debtor and Mr. Terhune, it became apparent that several of their joint projects were beginning to unwind due to a lack of capital, particularly with the withdrawal and cancellation of the Quadrant Homes projects. The Debtor placed ever increasing pressure on Mr. Terhune from the spring of 2008, through the end of the year to become current on monies he believed he was owed. When Mr. Terhune also threatened to set up his own spendthrift trust, the Debtor through his counsel made it clear to Mr. Terhune that the setting up of such a trust would be fraudulent as to him, as he considered himself a creditor.

The Examiner indicated in his report filed with the Court that the Debtor was or had to be aware of the "gathering storm clouds." In addition to the threat of a collapsing housing market, a review of court files after the establishment of the Trust reflects that several loans in

existence in August 2008 were fragile at best. The following are examples set forth in the Examiner's Report:

a. In *Columbia State Bank v. Donald G. Huber*, 10-2-08686-8, Pierce County, Columbia Bank sued the Debtor and his business partner, Robert Terhune, for failure to pay a promissory note of $3,370,000 executed on November 30, 2007, and secured by certain real property known as Ridge at Molasses Creek, LLC. The Debtor had personally guaranteed the note. The original maturity date of the note was June 1, 2008, but the borrowers negotiated an extension on that very day until December 1, 2008. No interest payments were subsequently made, and the loan was not paid at maturity. Columbia Bank issued a Notice of Default on February 5, 2009, and following foreclosure, the property was sold on July 10, 2009, in partial satisfaction of the obligation. The state court granted a default judgment for Columbia Bank against the Debtor on his guaranty for the remaining $1,659,245.46 on April 23, 2010. That obligation remains outstanding.

b. In *Frontier Bank v. Black Lake Estates, et al.*, 09-2-09503-3, Snohomish County, Frontier Bank sued Black Lake Estates, LLC (one of the Debtor's real estate holdings), the Debtor and Robert Terhune for failure to pay a promissory note of $1,706,000 executed on April 30, 2007. The Debtor had personally guaranteed the note. The maturity date of the note was extended multiple times, the last time from July 15, 2008, to October 15, 2008. An interest payment was made for approximately $9,000 on September 15, 2008, and although due and owing, no subsequent interest payments were made on this loan. Although Frontier Bank did not serve process on the Debtor until at least May 29, 2009, presumably he would have anticipated litigation if the loan was not repaid. The state court granted summary judgment for Frontier Bank against the Debtor on April 22, 2010, and that obligation remains unpaid.

c. In *Anchor Bank v. Oakland Bay Estates, LLC*, 09-2016750-3, Pierce County, Anchor Bank sued Oakland Bay Estates, LLC (one of the Debtor's real estate holding LLCs), the

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 4

Debtor and once again his business partner, Robert Terhune, for failure to pay a promissory note of $588,250 executed on March 13, 2006. The Debtor had personally guaranteed the note. The maturity date of the note was extended multiple times, the last time from July 1, 2008, to January 1, 2009, although the extension was not signed until the day after the Trust was signed. On September 30, 2008, an interest reserve account was established on the company's books and interest payments were applied against this account until funds were reduced to zero in February 2009; no subsequent interest payments were made on this loan. The state court granted summary judgment in favor of Anchor Bank against the Debtor on April 23, 2010. The obligation remains unpaid.

d. In a separate action *Anchor Mutual Savings Bank v. Terhune et. al.*, 10-2-16750-3, Anchor Bank sued the Debtor and Mr. Terhune for Oakland Bay Estates' failure to pay a different promissory note of $1,101,750 executed on January 23, 2006. The Debtor had personally guaranteed the note. The maturity date of the note was extended multiple times, the last time from July 1, 2008, to January 1, 2009, although the extension was not signed until September 24, 2008. On September 30, 2008, an interest reserve account was established on the company's books and interest payments were applied against this account until funds were reduced to zero in February 2009. No subsequent interest payments were made on this loan. The state court granted summary judgment against the Debtor on April 23, 2010.

It is well documented that in 2007 and 2008 nationally, as well as locally, the real estate market began to deteriorate due to the collapse of the subprime mortgage market and the implementation of more restrictive lending standards. On August 19, 2008, Kevin Huber, on behalf of his father, emailed attorney Harold Snow, an estate planning attorney, because "[m]y father has some assets that he would like to protect and shield." The Debtor subsequently retained Mr. Snow to set up an asset protection trust, called the Donald Huber Family Trust (Trust), which was established on September 23, 2008. Correspondence after drafting the

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 5

Trust document acknowledges that one of the Debtor's principal goals for creating the Trust was to "protect a portion of [the Debtor's] assets from [his] creditors." In a number of emails between the Debtor and Mr. Snow, the Debtor expressed urgency in setting up the Trust.

With the assistance of Mr. Snow, the Debtor transferred $10,000 in cash and his ownership or membership interest in over 25 entities into DGH, LLC, an Alaska limited liability company, set up on September 4, 2008, to receive those interests. DGH, LLC, after it was established, was owned 99% by the Trust and 1% by Kevin Huber, its manager. UWD's shares were transferred directly into the Trust and not through DGH, LLC. Assets such as the Debtor's residence at 8310 Warren Street in Tacoma were conveyed to an Alaska corporation (8310, LLC) and then into DGH, LLC. The 8310, LLC then leased the residence to the Debtor, and the Trust made the mortgage payments. The corporate assets were transferred in a similar fashion via quit claim deed to an Alaska corporation, then the new entity's interest into DGH, LLC. The Debtor acknowledges that he received no consideration for the transfers.

In summary, the assets owned or partially owned by the Debtor, either directly or indirectly, prior to the Trust implementation consisted of approximately 13 development projects, his residence and the residence of his disabled daughter, interests in several shopping centers, a few corporations, and $3 million dollars in uncollectable receivables. As of July 2010, and after the Trust was created and further after several entities/projects were either foreclosed or sold, the Debtor personally owned only a 5% interest in the James Center Professional Plaza, worthless notes and accounts receivable, and a 50% interest in Burnett Highlands, LLC. Meanwhile the Trust appeared to own the Debtor's holding and real estate operating companies, such as UWD Group, LLC, UWD Management, LLC, and DGH, LLC, as well as the residence occupied by his disabled daughter, an 85% interest in both the Kimball Center, LLC and Pioneer Plaza, LLC, PSEA, LLC, and Sure Seal, LLC. The Debtor was the trustor of the Trust, while Kevin Huber, Amber Haines, and Alaska USA Trust Company

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 6

(AUSA) were trustees. There was only one asset of the Trust held in Alaska, which is a certificate of deposit for $10,000 transferred there by the Debtor. All other assets are located in Washington State.

The ultimate beneficiaries of the Trust, beside the Debtor, consist of his sons Kevin and Dillon, daughters Darby and Neysa, and stepchildren Amber, Seth, Cedar and Star. The Debtor also has grandchildren that the Trust assists in paying for their educational expenses. The Trust established by the Debtor generated $345,248 in discretionary beneficiary income in 2010, and $360,000 in 2009.

In August 2011, the Debtor filed an amended Schedule I reflecting then current income of $17,444 per month. Of this amount, $1,300 was in the form of the Debtor's social security benefit. He also received social security income for each of his two minor children. The Debtor received trust income of $14,500 per month. The Debtor has provided documents showing the disbursements from the Trust assets following the resignation of Kevin Huber as a trustee. From October 1, 2010, through July 30, 2012, some of the expenses that the Trust paid out include the following:

Don Huber personal expenses: $9,977.09

Dylan Huber personal expenses: $6,055.32

Darby Huber personal expenses: $4,775.32

Groceries: $7,081.17

Loan payments: $2,325.05

Home personal expenses: $1,363.51

Cash: $17,000.00

Educational expenses for children and grandchildren: $66,502.14

Payments to Debtor's former spouse: $14,125.80

The payments to the Debtor's former spouse extended from October 2010, through July 2012.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 7

The total amount paid out from the Trust assets between October 1, 2010, and July 30, 2012, was $571,332.81. From the date of the filing of the chapter 11 petition on February 10, 2011, through July 30, 2012, the amount of the distributions was $406,837.27.

The Trustee contends that the Debtor made requests for disbursement from Kevin Huber, Kevin then prepared a request for a payment, and AUSA approved the disbursement, without any inquiry. The Debtor asserts, however, that Kevin Huber at times did refuse his requests for disbursements. It does not appear as if Kevin actually met with the representatives of AUSA. Further, the record before this Court indicates that AUSA did nothing to become involved with the perseveration and/or protection of the assets of the Trust and was acting merely in the nature of a straw man.

The Debtor filed for chapter 11 bankruptcy protection on February 10, 2011. On May 31, 2011, creditor Anchor Mutual Savings Bank filed a Motion for Appointment of Chapter 11 Trustee or Conversion to Chapter 7, with a hearing set for June 23, 2011. On June 23, 2011, the Court entered an agreed Order re: Motion for Appointment of Chapter 11 Trustee or Conversion to Chapter 7, which provided that the U.S. Trustee would appoint an examiner "to investigate and report the financial status of Debtor, including, but not necessarily limited to pre-petition transfers and the propriety of said transactions and shall have full subpoena powers concerning any and all parties necessary to thoroughly investigate said issues." (Bankruptcy Case No. 11-41013, Docket #61). The appointment of Eric D. Orse and Orse & Company, Inc. to serve as examiner was approved on June 27, 2011, and the Examiner's Report was filed on September 30, 2011. The case was converted to chapter 7, title 11 on October 21, 2011. The Plaintiff in this action is the duly appointed chapter 7 trustee. On November 19, 2012, an Order Granting Preliminary Injunction was entered preventing selected disbursements from the Trust.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 8

**Law**

A party seeking summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). All inferences drawn from the evidence presented must be drawn in favor of the party opposing summary judgment, and all evidence must be viewed in the light most favorable to that party. Summary judgment should be granted if, after taking all reasonable inferences in the nonmoving party's favor, the court finds that no reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). The responding party must present affirmative evidence in order to defeat a properly supported motion for summary judgment. The responding party may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Liberty Lobby, 477 U.S. at 256.

The moving party need only identify that evidence "which it believes demonstrates the absence of a genuine issue of material fact." Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 761 (9th Cir. 2008) (internal quotation marks omitted) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323). Once the party meets this initial burden, the burden shifts to the nonmovant "to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." F.T.C. v. Stefanchik, 559 F.3d 924, 927–28 (9th Cir. 2009) (citation and internal quotation marks omitted).

The Ninth Circuit Court of Appeals (Ninth Circuit) has determined that "[i]n opposing summary judgment, a nonmoving party must go beyond the pleadings and, by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (internal quotation marks omitted) (quoting Celotex Corp. v. Catrett, 477

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 9

U.S. 317, 324 (1986)); see also Estate of Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1033 n.14 (9th Cir. 2008). The nonmoving party must present significant probative evidence to support his or her allegations.

**A.   Validity of the Trust**

The Trustee initially contends that the Trust should be invalidated under Washington State law. The Trust was created in the State of Alaska and designates the law of Alaska to govern the Trust. Alaska recognizes self-settled asset protection trusts, see AS 34.40.110, but Washington does not, see RCW 19.36.020. As such, the parties agree there is a conflict in the laws of the two states, and the Court must look to choice of law rules for guidance.

**1.   <u>Choice of Law</u>**

"In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules." <u>Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)</u>, 59 F.3d 942, 948 (9th Cir. 1995). In applying federal choice of law rules, courts in the Ninth Circuit follow the approach of the Restatement (Second) of Conflict of Laws (1971) (Restatement). <u>Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys, Inc.</u>), 277 F.3d 1057, 1069 (9th Cir. 2002). Section 270 of the Restatement addresses the validity of an inter vivos trust in movables in relevant part as follows:

An inter vivos trust of interests in movables is valid if valid

(a) under the local law of the state designated by the settlor to govern the validity of the trust, provided that this state has a substantial relation to the trust and that the application of its law does not violate a strong public policy of the state with which, as to the matter at issue, the trust has its most significant relationship under the principles stated in § 6. [1]

---

[1] Section 6(2) sets forth general factors for consideration in a choice of law analysis, as follows:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 10

Comment b clarifies when a state has a substantial relation to the trust and when the law of the designated state will not be applied:

> *b. Law designated by the settlor to govern validity of the trust.* Effect will be given to a provision in the trust instrument that the validity of the trust shall be governed by the local law of a particular state, provided that this state has a substantial relation to the trust and that the application of its local law does not violate a strong public policy of the state with which as to the matter at issue the trust has its most significant relationship.
>
> A state has a substantial relation to a trust when it is the state, if any, which the settlor designated as that in which the trust is to be administered, or that of the place of business or domicil of the trustee at the time of the creation of the trust, or that of the location of the trust assets at that time, or that of the domicil of the settlor, at that time, or that of the domicil of the beneficiaries. There may be other contacts or groupings of contacts which will likewise suffice.
>
> .   .   .
>
> Although as to most grounds for invalidity the local law of the designated state will be applied, provided that this state has a substantial relation to the trust, it will not be applied if this would violate a strong public policy of the state with which as to the matter in issue the trust has its most significant relationship. Thus, where the settlor creates a revocable trust in a state other than that of his domicil, in order to avoid the application of the local law of his domicil giving his surviving spouse a forced share of his estate, it may be held that the local law of his domicil is applicable, even though he has designated as controlling the local law of the state in which the trust is created and administered.

Under the Restatement, the Debtor's choice of Alaska law designated in the Trust should be upheld if Alaska has a substantial relation to the Trust.  Restatement § 270(a).  Comment b provides that "a state has a substantial relation to a trust if at the time the trust is created: (1) the trustee or settlor is domiciled in the state; (2) the assets are located in the state; and (3) the beneficiaries are domiciled in the state.  These contacts with the state are not exclusive."  In re Zukerkorn, 484 B.R. 182, 192 (9th Cir. BAP 2012).  In the instant case, it is

---

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 11

undisputed that at the time the Trust was created, the settlor was not domiciled in Alaska, the assets were not located in Alaska, and the beneficiaries were not domiciled in Alaska. The only relation to Alaska was that it was the location in which the Trust was to be administered and the location of one of the trustees, AUSA.

Conversely, it is undisputed that at the time the Trust was created, the Debtor resided in Washington; all of the property placed into the Trust, except a $10,000 certificate of deposit, was transferred to the Trust from Washington; the creditors of the Debtor were located in Washington; the Trust beneficiaries were Washington residents; and the attorney who prepared the Trust documents and transferred the assets into the Trust was located in Washington. Accordingly, while Alaska had only a minimal relation to the Trust, using the test set forth in Comment b, Washington had a substantial relation to the Trust when the Trust was created.

Additionally, Washington State has a strong public policy against self-settled asset protection trusts. Specifically, pursuant to RCW 19.36.020, transfers made to self-settled trusts are void as against existing or future creditors. Carroll v. Carroll, 18 Wn.2d 171, 175 (1943). This statute has been in existence for well over a century, as it was first enacted in 1854. This policy is consistent with those in other states. For instance, in Marine Midland Bank v. Portnoy (In re Portnoy), 201 B.R. 685, 701 (Bankr. S.D.N.Y. 1996), the bankruptcy court considered the public policy of New York against self-settled trusts when determining a choice of law issue: "Portnoy may not unilaterally remove the characterization of property as his simply by incorporating a favorable choice of law provision into a self-settled trust of which he is the primary beneficiary. Equity would not countenance such a practice." As with New York, Washington has a policy that a debtor should not be able to escape the claims of his creditors by utilizing a spendthrift trust. Thus, in accordance with § 270 of the Restatement, this Court

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 12

will disregard the settlor's choice of Alaska law, which is obviously more favorable to him, and will apply Washington law in determining the Trustee's claim regarding validity of the Trust.

**2.** **RCW 19.36.020**

Interests in property are determined by state law.  <u>Butner v. United States</u>, 440 U.S. 48, 54-55, 99 S. Ct. 914 (1979).  RCW 19.36.020 provides in relevant part as follows:

> That all deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the existing or subsequent creditors of such person.

The Trust is admittedly a self-settled trust.  In accordance with RCW 19.36.020, the Debtor's transfers of assets into the Trust were void as transfers made into a self-settled trust. <u>See</u> <u>Rigby v. Mastro (In re Mastro)</u>, 465 B.R. 576, 611 (Bankr. W.D. Wash. 2011) (where a bankruptcy judge applying Washington State law held that the debtors' transfers of assets into a self-settled trust were void).  The Debtor has provided no legal authority to the contrary. Accordingly, the Debtor's transfers of assets into the Trust are void, and the Trustee is entitled to summary judgment as a matter of law to the extent the Trustee seeks to have the transfers invalidated.

The Debtor's untimely Supplemental Memorandum does not warrant a different result. As set forth in the Trustee's Memorandum of Authorities filed in response to the Supplemental Memorandum, the issue presented does not satisfy RCW 2.60.020.  RCW 19.36.020 clearly determines that the transfer of assets into a self-settled trust is void.  Thus, there is no need and grounds do not exist to have the issue certified to the Washington State Supreme Court.

**B.** **Alter Ego Doctrine**

Alternatively, the Trustee seeks to have the Trust declared the alter ego of the Debtor and apply "reverse piercing" to the Trust in order to bring its assets into the bankruptcy estate.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 13

The Debtor contends that issues of material fact exist regarding the Debtor's intent in creating the Trust, thereby precluding summary judgment on this claim.

In determining whether alter ego liability applies, the Court applies the law of the forum state. E.g., Towe Antique Ford Found. v. I.R.S., 999 F.2d 1387, 1391 (9th Cir. 1993).[2] Washington recognizes the alter ego doctrine in the context of corporations: "'Where a private person so dominates and controls a corporation that such corporation is his *alter ego*, a court is justified in piercing the veil of corporate entity and holding that the corporation and private person are one and the same.'" Standard Fire Ins. Co. v. Blakeslee, 54 Wn. App. 1, 5 (1989) (quoting Pohlman Inv. Co. v. Virginia City Gold Mining Co., 184 Wash. 273, 283 (1935)). The Trustee acknowledged at the summary judgment hearing that no court in Washington has applied the alter ego doctrine in a trust context, but asks the Court to decide this issue of first impression in his favor. In the absence of controlling authority, the Court must attempt to determine how the Washington State Supreme Court would resolve this issue. See Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85, 90-91 (2nd Cir. 2003).

The Court has reviewed the federal cases cited by the Trustee that have applied the alter ego doctrine to trusts based on the forum state law. These cases, however, are not controlling and shed no light on whether Washington courts would extend the alter ego theory to trusts. It is clear that federal courts that have chosen to extend this doctrine to trusts have done so after careful review and analysis of the forum state's statutes and case law. The Trustee has failed to present any Washington authority, or any argument predicated on Washington law, to assist this Court in making a determination as to whether Washington courts would extend the alter ego doctrine to trusts. The Trustee further has failed to address whether a trust, as opposed to a trustee, can legally be the alter ego of an individual, an issue

---

[2] None of the cases cited by the Trustee requires this Court to apply the federal common law of alter ego in this case. Moreover, the federal cases cited by the Trustee in support of his argument to extend alter ego liability to trusts in Washington, including Goodrich v. Briones (In re Schwarzkopf), 626 F.3d 1032, 1037 (9th Cir. 2010), uniformly applied the forum state law of alter ego.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 14

that has been thoughtfully considered by leading trust experts and several state courts, including recently by the California Court of Appeals in <u>Greenspan v. LADT, LLC</u>, 191 Cal. App. 4th 486, 521-22 (2011). <u>See</u> Elizabeth M. Schurig & Amy P. Jetel, 1 <u>Asset Protection: Dom. & Int'l L. & Tactics</u> § 2:10 (2013); Richard W. Nenno, 2 <u>Asset Protection: Dom. & Int'l L. & Tactics</u> § 14A:120 (2013) (a trust's status as a non-entity logically precludes a trust from being an alter ego, but it is reasonable to ask whether a trustee is the alter ego of a defendant who made a transfer into a trust).

The Trustee has the burden of demonstrating that it is entitled to summary judgment as a matter of law. Absent any Washington authority or argument to support Trustee's position, this Court will not speculate as to whether Washington courts would apply the alter ego doctrine in the trust context, and if so, whether they would limit application to trustees as in the <u>Greenspan</u> case. Accordingly, the Court concludes that the Trustee has not met its burden on the alter ego theory. Notwithstanding this, in light of the Court's decision as to the invalidity of the transfers pursuant to RCW 19.36.020, the Court need not decide the alter ego issue under Washington law.

**C.      11 U.S.C. § 548(e)(1)**

The Trustee also seeks summary judgment under 11 U.S.C. § 548(e)(1), arguing that the Debtor's transfers of assets into the Trust should be avoided. That this Court has determined already that such transfers are void under RCW 19.36.020 does not preclude a determination that the transfers also are fraudulent under § 548(e)(1). <u>See</u> <u>Mastro</u>, 465 B.R. at 610-611.

11 U.S.C. § 548(e)(1) provides as follows:

> In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of the filing of the petition, if —
>
>         (A)      such transfer was made to a self-settled trust or similar device;

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 15

(B)    such transfer was by the debtor;

(C)    the debtor is a beneficiary of such trust or similar device; and

(D)    the debtor made such transfer with actual intent to hinder, delay,
       or defraud any entity to which the debtor was or became, on or
       after the date that such transfer was made, indebted.

The parties agree that each of the elements of § 548(e)(1) has been established except for the last element: whether the Debtor made the transfers to the Trust "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted." The Trustee contends that the overwhelming evidence establishes the Debtor's intent to hinder, delay and defraud his creditors, while the Debtor argues there is an issue of material fact as to his intent.

The Trustee has the burden of proving the elements of a fraudulent conveyance by a preponderance of the evidence. Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.), 168 B.R. 408, 418 (Bankr. D. Ariz. 1994) (citing Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654 (1991)); see W. Wire Works, Inc. v. Lawler (In re Lawler), 141 B.R. 425, 428 (9th Cir. BAP 1992) ("A fair reading of the Supreme Court's opinion leads to the inference that the preponderance standard applies in all bankruptcy proceedings grounded in allegations of fraud.").

"The language used for the level of intent tracks identical language in section 548(a)(1)(A), presumably to allow courts to use cases and interpretive guides for such language (which has been part of Anglo-American jurisprudence since at least 1571) when called upon to construe section 548(e)." 5 Collier on Bankruptcy ¶ 548.07[3][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Fraudulent intent may be established on the basis of circumstantial evidence. Barclay v. Mackenzie (In re AFI Holding, Inc.), 525 F.3d 700, 704 (9th Cir. 2008). In assessing the evidence, courts consider "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 16

to an inference of intent." In re Roca, 404 B.R. 531, 543 (Bankr. D. Ariz. 2009) (internal quotes omitted).

The Ninth Circuit has articulated that

[a]mong the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.

Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806 (9th Cir. 1994) (emphasis omitted) (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991)). "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Acequia, 34 F.3d at 806 (quoting Max Sugarman, 926 F.2d at 1254-55). Once the trustee establishes indicia of fraud, the burden shifts to the transferee to prove some "legitimate supervening purpose" for the transfer. Acequia, 34 F.3d at 806.

In support of his motion for summary judgment, the Trustee submitted over one hundred exhibits containing declarations, emails, documents, and pleadings to establish the Debtor's intent to hinder, delay, or defraud his creditors. Conversely, the only evidence submitted by the Debtor on summary judgment is the Debtor's deposition testimony taken on September 20, 2011, by counsel for the Examiner. Even though not accompanied by a declaration, the deposition is authenticated for summary judgment as it identifies the names of the deponent and the action, and it includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Orr v. Bank of America, 285 F.3d 764, 774 (9th Cir. 2002) (citing Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1)). Notably, while the deposition references numerous exhibits, the Debtor did not file these exhibits with the Court.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 17

Accordingly, the deposition it is of minimal value to the Court, particularly as it fails to designate specific portions rebutting the very specific allegations of the Trustee.  See Bias, 508 F.3d at 1218.  Additionally, the Court arguably has grounds to disregard this deposition since it was taken prior to the Trustee's appointment on October 21, 2011, and does not respond to many of the arguments made by the Trustee in his motion for summary judgment.  See Fed. R. Civ. P. 32(a)(1), made applicable by Fed. R. Bankr. P. 7032.  Because the Court reaches the same outcome on the Trustee's § 548(e)(1) claim even if the deposition is considered, however, the Court declines to exclude the Debtor's previously taken deposition submitted in opposition to summary judgment.

Considering each of the badges of fraud, the evidence submitted by the Trustee first establishes that at the time the Debtor transferred his assets into the Trust, there was threatened litigation against the Debtor.  Specifically, it appears that foreclosure of several properties for which the Debtor had guaranteed the bank loans was becoming increasingly certain, including Ridge at Molasses Creek, LLC, Black Lake Estates, and Oakland Bay Estates.  The maturity dates on these loans had been extended at least one time; the local and national real estate markets were collapsing; Robert Terhune had not, and apparently could not, repay the Debtor an approximately one million dollar debt, on which the Debtor depended to service the loans; and by March 2008, the Debtor was not making timely payments on his project debts, which he had guaranteed.  Ultimately, litigation ensued, beginning in spring 2009.  While the Debtor's responsive pleading states that nothing indicates the Debtor anticipated that the loans would not be further extended, the Debtor submitted no declaration or evidence in support of this proposition.

The Trustee also has established that the Debtor transferred all or substantially all of his property into the Trust.  It is undisputed that the Debtor transferred $10,000 in cash and his ownership or membership interest in over 20 entities into DGH, LLC, which was owned 99% by

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 18

the Trust and 1% by Kevin Huber. These entities included the Debtor's residence at 8310 Warren Street; his daughter's residence; interests in several shopping centers; 13 development projects; and a few corporations. The Debtor also transferred UWD's shares directly into the Trust. The Trustee presented evidence that after the Trust was created and several entities were either foreclosed or sold, the Debtor personally owned only a 5% interest in the James Center Professional Plaza, worthless notes and accounts receivable, and a 50% interest in Burnett Highlands, LLC. The Trust, on the other hand, appeared to own most of the Debtor's income-producing assets. According to the Examiner, 71.1% of the Debtor's assets were transferred to the Trust, while 28.9% remained outside the Trust. This has not been rebutted by the Debtor.

The Trustee further has established significant indebtedness on the part of the Debtor when he transferred his assets into the Trust. The Trustee's evidence indicates that in 2007, the Debtor began to experience substantial financial problems. To raise money, he had to sell a portion of his interest in the James Center Professional Plaza, which generated a $177,000 tax in 2007. The evidence, including emails from the Debtor, establishes that the Debtor was unable to pay this tax debt when due, and it remains unpaid to date. Additionally, during the period that the Trust was formed and assets transferred, the Debtor had increased his pressure on Robert Terhune, without success, in order to obtain capital to service his debts. As set forth in the Debtor's emails, the debt load was "strangling" the Debtor and "bills [went] unpaid." Furthermore, during this period, the Debtor had expended approximately $70,000 - $100,000 per month for one year in his efforts to obtain funding through Houlihan Lokey, which also proved unsuccessful.

As to the fourth badge of fraud, the Debtor does not dispute that there is a special relationship, as he is both the trustor and beneficiary of the trust.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 19

The Trustee also has established that the Debtor effectively retained the property transferred into the Trust. While the Debtor indicated in his deposition that he did not retain the right to direct how or if distributions were made from the Trust, it appears that substantially all of the Debtor's requests for distributions were granted. Only one reference was set forth in the deposition of any refusal. Furthermore, the only party to review the requests was his son Kevin Huber, with whom he was in business at the time. The record indicates that AUSA did absolutely nothing to become involved with the preservation or protection of the Trust assets, but merely acted as a straw man. Additionally, the Debtor continued to reside in a Trust asset and to receive some $14,500 per month in trust income, which went toward his personal expenses, loan payments, cash, education expenses for his family, and payments to his former spouse, all at the expense of his creditors. Based on the evidence before the Court, the only reasonable conclusion is that the Debtor continued to use and enjoy the Trust assets just as he did before the transfers.

The Trustee has established that the five badges of fraud exist in this case; the Debtor has not raised a genuine dispute as to these badges. In addition, the Trustee's evidence indicates that in the face of the declining real estate market, the Debtor's inability to secure funding, and mounting debt, the Debtor was afraid that he would lose everything he had worked so hard to achieve. While the Debtor alleges that he consulted Mr. Snow and created the Trust merely for estate planning purposes, the timing of the Trust's creation, the facts surrounding its creation, and timing of the asset transfers support a finding of a motive other than estate planning, that of asset protection at the expense of his creditors. Furthermore, the Debtor has not presented any evidence refuting the Trustee's overwhelming evidence that when the Trust was created, the Debtor was desperate to protect his assets and knowledgeable of the purpose of a spendthrift trust.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 20

The Debtor argues that his reliance on legal counsel in creating the Trust negates fraudulent intent. Even if the Debtor had presented evidence that he relied on the advice of counsel in creating the Trust and transferring his assets, such reliance must have been in good faith. See First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986) ("[g]enerally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge," but such reliance must be in good faith). A finding that the debtor knew that the purpose of the transfers was to hinder or delay creditors "precludes the defense of good faith reliance on the advice of an attorney even if the client is otherwise innocent of any improper purpose." Adeeb, 787 F.2d at 1343. In the instant case, the Debtor's deposition testimony establishes that he was well aware of the effect of a spendthrift trust, as he testified that through counsel he forbid Mr. Terhune from putting his assets into a spendthrift trust until the parties reached an agreement as to the debt Mr. Terhune owed him. The Debtor clarified his reasoning: "Mr. Terhune didn't have anything other than the properties that we owned together and his house. So if he transferred them, I'd have nothing to secure me." Additionally, at the hearing, the Debtor failed to present any plausible reason to create a self-settled asset protection trust other than to shield assets from creditors.

Accordingly, the evidence presented by the Trustee supports an inference of actual fraudulent intent by the Debtor to hinder, delay, or defraud his current or future creditors, in violation of § 548(e)(1)(D). The Trustee is entitled to summary judgment on this claim as a matter of law.

**D.      11 U.S.C. § 544(b)(1) and RCW 19.40.041(a)**

Section 544(b)(1) gives the Trustee the authority to bring an action to avoid fraudulent transfers under state law. Under the Uniform Fraudulent Transfer Act (UFTA), a transfer is fraudulent if the debtor acts with actual intent to hinder, delay, or defraud a creditor, or transfers "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation."

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 21

RCW 19.40.041(a)(1) - (2). The party alleging the fraudulent transfer must demonstrate actual intent to defraud by "clear and satisfactory proof." Clearwater v. Skyline Const. Co., Inc., 67 Wn. App. 305, 321 (1992). Circumstantial evidence of intent may be considered. United States v. Black, 725 F. Supp. 2d 1279, 1291 (E.D. Wash. 2010). In determining whether actual intent exists, a court may consider eleven factors, or badges of fraud, set forth in RCW 19.40.041(b):

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

These factors are "non-exclusive and precatory, indicating that other evidence impacting on intent should also be considered." Sedwick v. Gwinn, 73 Wn. App. 879, 886 (1994).

Several of these badges of fraud overlap those considered in the Ninth Circuit in analyzing 11 U.S.C. § 548. The Court already has determined that the Trustee established the

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 22

Debtor was threatened with litigation when the transfers occurred; the transfers were of substantially all the Debtor's assets; and the Debtor retained control of the transferred property. The evidence also establishes that as a self-settled trust, the transfer from the Debtor to the Trust was to an insider. For the same reason, the Debtor concedes he did not receive consideration for transferring his assets to the Trust. Additionally, the evidence establishes that by transferring the property into the Trust, the Debtor was attempting to remove the assets from the creditors' reach.

In addition to these factors, as set forth in the Court's § 548(e) analysis, the Trustee's evidence further shows that in the face of the declining real estate market, the Debtor's inability to secure funding, and mounting debt, the Debtor was concerned that he would lose all of his assets to his creditors. A review of the evidentiary record before the Court is overwhelming that the Debtor was desperate to protect and shield his assets. There is almost no evidence to the contrary.

The Debtor, however, contends that his denial that he had fraudulent intent is sufficient to raise an issue of material fact. In <u>Sedwick</u>, the court concluded that "where the debtor denies that his or her intent was to defraud, the issue cannot be conclusively determined by the trier of fact until it has heard the testimony and assessed the witnesses' credibility," making summary judgment inappropriate. <u>Sedwick</u>, 73 Wn. App. at 887. <u>Sedwick</u>, however, is inapposite because the debtor there submitted not only his own affidavit, but the affidavit testimony of other witnesses that was consistent with the debtor's affidavit. In these affidavits, each witness stated that there was no intent to defraud the plaintiff.

In the instant case, the Debtor failed to submit his own declaration regarding his intent, let alone the declarations of other witnesses, such as Mr. Snow and Kevin Huber, who would be the witnesses most likely to testify as to the Debtor's intent in creating the Trust and transferring his assets. Moreover, while the Debtor's deposition testimony states that he

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 23

created the Trust for estate planning purposes, it does not directly address or deny the evidence submitted by the Trustee establishing that the Debtor wanted to protect his assets in light of his increasingly bleak financial situation.  The Court finds that the Debtor's desire to provide for his children and grandchildren through estate planning by protecting his assets that they would otherwise stand to inherit, is not mutually exclusive of the desire to shield his assets from creditors.  Accordingly, estate planning alone does not create an issue of fact as to intent. See Adeeb, 787 F.2d at 1343 (where the court held that if a debtor intended to hinder or delay a creditor, he had "the intent penalized by [section 727(a)(2)(A)] notwithstanding any other motivation he may have had for the transfer.").  Furthermore, as previously indicated, the Debtor's deposition testimony regarding Mr. Terhune's goal to transfer his assets into his own spendthrift trust establishes that he knew the purpose of a spendthrift trust.

Accordingly, viewing the evidence in the light most favorable to the Debtor, the Trustee has established that there is no genuine dispute as to any material fact, and the Trustee is entitled to summary judgment as a matter of law on its UFTA claim based on actual fraudulent intent.[3]

E.    **Denial of Discharge**

Section 727(a)(2) precludes discharge when the debtor, with intent to hinder, delay, or defraud a creditor has transferred, removed, destroyed, mutilated, or concealed property of the debtor within one year before the petition date, or property of the estate after the petition date. 11 U.S.C. § 727(a)(2)(A) - (B).  The Trustee concedes that the Debtor's transfers of his assets into the Trust cannot satisfy § 727(a)(2)(A), as the transfers occurred more than one year before the petition date.  Yet the Trustee contends that the Debtor's use of the Trust assets, which belong to the estate, within one year of the date of the filing and the continuing use thereafter satisfies § 727(a)(2)(A) and (B).

---

[3] While the Trustee referenced constructive fraud in passing, this claim was not fully briefed or argued.  In light of the Court's conclusion regarding actual intent, the Court need not reach this claim.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 24

Denial of discharge under § 727 is construed liberally in favor of the debtor and strictly against those objecting to discharge. <u>Adeeb</u>, 787 F.2d at 1342. A debtor's intent need not be fraudulent to establish § 727(a)(2). Based on the disjunctive language of the statute, it is sufficient if the debtor's intent is to hinder or delay a creditor. <u>Retz v. Samson (In re Retz)</u>, 606 F.3d 1189, 1200 (9th Cir. 2010). Certain badges of fraud may support a finding of fraudulent intent. <u>Retz</u>, 606 F.3d at 1200.

The Trustee's claims are predicated on the assertion that the Debtor wrongfully used assets in the Trust to maintain his pre-petition lifestyle and pay his pre-petition creditors. Although the Court has ruled that transfers of the Debtor's assets into the Trust are void under RCW 19.36.020, the record before the Court establishes that the Debtor created the Trust and transferred his assets pursuant to AS 34.40.110 and with the assistance of legal counsel. Considering that this Court is to construe § 727(a)(2)(A) and (B) liberally in favor of the Debtor and against the creditor, the Court concludes that there is a genuine issue of material fact as to whether the Court should deny his discharge.

The Trustee further contends that the Debtor wrongfully used $350,839 in net loss carry forwards that belongs to the Trustee. According to the Trustee, this significantly reduced the Debtor's taxes at the expense of the potential taxes on the bankruptcy estate. While the Debtor's response to summary judgment asserts the Debtor was unaware this was estate property and that it will be returned to the bankruptcy estate, the Debtor has not submitted an affidavit to this effect. Nonetheless, the Trustee has failed to present any evidence of intent by the Debtor to hinder, delay, or defraud creditors in so doing. Because it is the Trustee's burden on summary judgment to establish there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law, the Court concludes that the Trustee has not met his burden as to this contention.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 25

Finally, the Trustee argues that the Debtor failed to disclose in his bankruptcy schedules that UWD owes the Debtor more than two million dollars for loans made by the Debtor, which is cause for denial of discharge. Section 727(a)(4)(A) provides that the court shall grant a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account." To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show by a preponderance of the evidence that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." Retz, 606 F.3d at 1197 (quoting Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (9th Cir. BAP 2005)). An omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath. Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007).

To demonstrate fraudulent intent, the plaintiff must show that that the debtor made the false oaths or omissions; he knew they were false at the time; and he made them with "intention and purpose of deceiving the creditors." Retz, 606 F.3d at 1198-99 (quoting Khalil, 379 B.R. at 173). "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." Retz, 606 F.3d at 1199. Thus, a party objecting to a debtor's discharge on false oath grounds must establish "that the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless or failed to fully understand his attorney's instructions." Dubrowsky v. Estate of Perlbinder (In re Dubrowsky), 244 B.R. 560, 571-72 (E.D. N.Y. 2000).

The Debtor argues that he at all times has been forthright with the Trustee regarding his UWD business dealings and records. He offers that as part of doing business as an entrepreneur, he made cash infusions to UWD without the expectation that he would be repaid. Yet once again the Debtor provides no independent evidence or affidavit to this effect.

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 26

Nonetheless, the Trustee has failed to establish that the Debtor intended to deceive his creditors in failing to list loans he made to UWD, particularly as it appears from the deposition testimony of Jorge Duque, UWD's Chief Financial Officer, that he made these loans without the expectation of repayment. As such, the Trustee has not established one of the necessary elements of § 727(a)(4), and consequently is not entitled to summary judgment on this claim. See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in Alabama, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (when the moving party has the burden of proof at trial, the party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party).

Based on the foregoing, it is hereby

**ORDERED** that the Trustee is granted summary judgment on his claim made pursuant to RCW 19.36.020; it is further

**ORDERED** that the Trustee is granted summary judgment on his claim made pursuant to 11 U.S.C. § 548(e)(1); it is further

**ORDERED** that the Trustee is granted summary judgment on his claim made pursuant to 11 U.S.C. § 544(b)(1) and RCW 19.40.041(a); it is further

**ORDERED** that the Trustee has not established that he is entitled to summary judgment on his alter ego claim or claims made pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4).

///End of Order///

ORDER GRANTING TRUSTEE
PARTIAL SUMMARY JUDGMENT - 27