Entered on Docket November 25, 2013

**Below is a Memorandum Decision of the Court.**



_____
**Paul B. Snyder**
**U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| In re:<br><br>DONALD G. HUBER,<br><br>                          Debtor. | **Case No. 11-41013** |
| MARK D. WALDRON, Trustee for the estate of Donald G. Huber,<br><br>                          Plaintiff,<br><br>v.<br><br>DONALD G. HUBER, a single man; KEVIN D. HUBER, individually and as Trustee of the DONALD HUBER FAMILY TRUST; ALASKA U.S.A. TRUST COMPANY, as Trustee of the DONALD HUBER FAMILY TRUST; GARY M. DREYER and CONSTANCE M. DREYER, as Trustees of the DREYER FAMILY LIVING TRUST dated May 12, 1999; KIMBALL CENTER, L.L.C., an Alaska limited liability company; DGH, L.L.C., an Alaska limited liability company; 8310 L.L.C., an Alaska limited liability company; 3505 N. Gove, L.L.C. a/k/a 3305 N. Gove, L.L.C., an Alaska limited liability company; PIONEER PLAZA, L.L.C., an Alaska limited liability company; PSEA, L.L.C., an Alaska limited liability company; SURE SEAL, L.L.C., a Washington limited liability company; and JOHN DOE, entities 1 through 50,<br><br>                          Defendants. | **Adversary No. 12-04171**<br><br>**MEMORANDUM DECISION ON DREYERS' MOTION FOR SUMMARY JUDGMENT** |

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 1

This matter came before the Court on October 9, 2013, on the Motion for Summary Judgment filed by Gary M. and Constance M. Dreyer (Dreyers), seeking a determination that Mark Waldron, Trustee for the estate of Donald G. Huber (Trustee), acquired only an economic interest in Kimball Center, L.L.C. (Kimball) and Pioneer Plaza, L.L.C. (Pioneer) when the Trustee obtained control of DGH, L.L.C. (DGH) pursuant to the Court's Order Granting Trustee Partial Summary Judgment entered on May 17, 2013, and Order Compelling Turnover of Assets entered on July 16, 2013. The Trustee opposed the Dreyers' motion. At the conclusion of the hearing, the Court took the matter under advisement. Based on the arguments and pleadings presented, the Court's opinion is as follows:

The facts relevant to the issue before the Court are not in dispute.[1] On September 4, 2008, Kimball and Pioneer were formed as Alaska limited liability companies (L.L.C.s), each owned 85% by DGH[2] and 15% by the Dreyer Family Trust. That same month, Donald G. Huber (Debtor) created the Donald Huber Family Trust (Trust), in which he transferred substantially all of his assets, including DGH. On December 3, 2008, the Debtor and the Dreyers recorded quit claim deeds previously executed in September 2008, placing real property into Kimball and Pioneer.

On February 10, 2011, the Debtor filed for bankruptcy protection under chapter 11, title 11.[3] On October 21, 2011, the case was converted to chapter 7. On May 8, 2012, the Trustee filed the current adversary proceeding against the Debtor, the Dreyers, and several other defendants alleging, among other claims, that the Debtor made transfers to the Trust in

---

[1] For a more comprehensive statement of facts, the Court incorporates those facts set forth in the Order Granting Trustee Partial Summary Judgment entered on May 17, 2013. ECF No. 142.

[2] When formed, DGH was owned 100% by the Debtor. While 1% of DGH subsequently was assigned to Kevin D. Huber, as a result of a settlement between the Trustee and Kevin Huber, Kevin Huber's interest in DGH was voided.

[3] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. § § 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 2

**Below is a Memorandum Decision of the Court.**

violation of § 548(e)(1), § 544(b)(1) and RCW 19.40.041(a), and RCW 19.36.020. The Dreyers filed their summary judgment motion on February 21, 2013, prior to the Court's determination regarding the Trust assets. The parties agreed to continue the motion until after the Court had made its decision as to the ownership of the Trust assets.

On May 17, 2013, the Court entered an Order Granting Trustee Partial Summary Judgment, concluding that the Debtor's transfers of assets into the Trust were void under RCW 19.36.020 as transfers made into a self-settled trust. The Court also concluded that the Debtor transferred assets into a self-settled trust with actual intent to hinder, delay, or defraud creditors in violation of § 548(e)(1), and the Debtor fraudulently conveyed assets into the Trust in violation of § 544(b)(1) and RCW 19.40.041(a), the Washington State Uniform Fraudulent Transfer Act. The Trustee thereafter filed a motion requesting Alaska U.S.A. Trust Company to turn over all assets of the Trust. The Court granted the Trustee's motion by order entered on July 16, 2013.

In a companion adversary proceeding involving the Debtor and the Dreyers, Adversary Case No. 13-04267, the Court entered an order holding that the assets of the Trust became "property of the estate" effective May 17, 2013. Consequently, the Trustee, standing in the shoes of the Debtor, now holds 100% of the membership interests in DGH. See Smith v. Arthur Andersen L.L.P., 421 F.3d 989, 1002 (9th Cir. 2005) (where the Ninth Circuit Court of Appeals (Ninth Circuit) held that under the Code, the trustee stands in the shoes of the debtor).

The Trustee, through DGH's 85% membership interest in Kimball and Pioneer, seeks to assert management control of these L.L.C.s over the Dreyers' objection. The Dreyers concede that the Trustee succeeded to the Debtor's economic rights in Kimball and Pioneer. The issue now before the Court is whether a chapter 7 trustee who succeeded to the membership rights of an entity that was owned 100% by the debtor, also succeeded to the non-economic

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 3

membership rights of a subsidiary multi-member L.L.C., when the other L.L.C. member does not consent to the trustee's management interest.

A party seeking summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). All inferences drawn from the evidence presented must be drawn in favor of the party opposing summary judgment, and all evidence must be viewed in the light most favorable to that party. Summary judgment should be granted if, after taking all reasonable inferences in the nonmoving party's favor, the court finds that no reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986).

Under § 541(a)(1), property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." Estate property also includes "[a]ny interest in property that the trustee recovers under section . . . 550," and "[a]ny interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title." § 541(a)(3) and (4). While federal law defines "property of the estate," state law determines the nature and extent of a debtor's interest in property. Butner v. United States, 440 U.S. 48, 54-55, 99 S. Ct. 914 (1979).

In the instant case, the Trustee acquired the Debtor's interest in Kimball and Pioneer through the Debtor's 100% interest in DGH. The Dreyers contend that the Limited Liability Company Agreements of both Pioneer and Kimball (Operating Agreement), which are almost identical in terms, limit the Trustee's interest in the L.L.C.s to an economic interest. It is the Trustee's position, however, that federal bankruptcy law trumps any anti-transfer provisions in the Operating Agreement so that the Trustee acquired *all* of DGH's rights in Pioneer and Kimball, including management and voting rights. "Section 541(c)(1)(A) overrides both contract and state law restrictions on the transfers or assignments" of debtors' interests in an entity "in

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 4

order to sweep all their interests into their estate." Fursman v. Ulrich (In re First Protection, Inc.), 440 B.R. 821, 830 (9th Cir. BAP 2010).

The Trustee's argument, however, ignores the plain language of § 541(c)(1), which provides in relevant part that "an interest of the debtor in property becomes property of the estate *under subsection (a)(1), (a)(2), or (a)(5) of this section* notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor . . . ." § 541(c)(1) (emphasis added). It is the fundamental principle of statutory construction that a court begin "with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S. Ct. 1026 (1989). "[W]here . . . the statute's language is plain, the sole function of the courts is to enforce it according to its terms." Ron Pair, 489 U.S. at 241 (internal quotation marks omitted). The Court is bound by the plain language of the statute, which expressly limits the application of § 541(c)(1) to property acquired by § 541(a)(1), (a)(2), or (a)(5). The only other court that appears to have ruled on this issue reached the same conclusion in Texas Attorney General v. Brown (In re Forth Worth Osteopathic Hospital, Inc.), 387 B.R. 706, 713 (Bankr. N.D. Tex. 2008). Examining the application of § 541(c)(1), the bankruptcy court held as follows:

> Because it operates only with respect to property that in those ways becomes property of the estate, section 541(c)(1) has no application to property the estate acquires through, e.g., fraudulent conveyance suits (11 U.S.C. § 541(a)(3) and (4)) or property that comes into the estate postpetition as profits or proceeds of property held by a debtor at case commencement. 11 U.S.C. § 541(a)(6).

The Court concludes that for purposes of the Trust assets that became property of the estate under § 541(a)(3) or (4), the Code does not override any transfer restrictions the Operating Agreement may contain. Accordingly, the Court must examine the Operating Agreement and state law to determine what interests the Trustee acquired in Kimball and Pioneer.

The Operating Agreement contains the following definitions under Article 1, Section 1.1:

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 5

> "Assignee" means the holder or transferee of an interest in the Company who has not been admitted as a Member of the Company. An Assignee shall have no right to participate in the Management of the business and affairs of the Company. An Assignee shall have no right to vote on any matter requiring member vote. An assignee is entitled to share in such profits and losses, to receive such distributions, and to receive such allocations of income, gain, loss, deduction or credit or similar item to which the assignor was entitled, subject to the limitations applicable to the assignor, to the extent of the transferred interest.
>
> "Company" means Kimball Center, LLC [and Pioneer Plaza, LLC], formed and operated in accordance with the terms and conditions of this Agreement.
>
> "Entity" means any general partnership limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, estate, business trust, cooperative, association, or any other organization that is not a natural Person.
>
> "Member" or "Members" means . . . a holder or transferee of an interest in the Company who is an Assignee and not a Member. Nonetheless, the powers, rights, duties, and obligations of an Assignee shall be limited as described in the definition of an Assignee in this Agreement.
>
> "Transfer" means any sale, assignment, gift, exchange, pledge, encumbrance, devise, bequest, intestate transfer, change in beneficial interest of any trust or estate, distributions from any trust or estate, change in ownership of Entity members, or any other disposition of a Membership Interest, whether voluntary or involuntary.

Pursuant to Article 6, Section 6.1.,

> [t]o be admitted as a member, an Assignee must: (a) obtain the written consent of the Manager and all the Members, which consent may be withheld by each Member in his or her sole and absolute discretion; and (b) deliver to the Company a fully executed New Member Agreement substantially in the form of the attached <u>Schedule C.</u>

Article 12, Section 12.1 provides that "[a]n Assignee holding a Membership Interest may become a Member upon satisfaction of <u>Section 6.1</u>."

The Dreyers argue that the Trustee's acquisition of DGH was a change in ownership of DGH, which in turn was a "transfer" under the Operating Agreement. "Transfer" includes any "change in ownership of Entity members," which by definition includes DGH. The Dreyers contend that the Operating Agreement requires the consent of non-transferring members to the admission of a transferee as a member. They argue that since they do not consent to the

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 6

Trustee's admission as a member, the Trustee acquires only the rights of an assignee, which are economic rights. The Dreyers note that these limitations on the rights of assignees of members' interests in L.L.C.s are also authorized by state law, AS 10.50.165.[4]

There is legal support for the Dreyers' argument that the Trustee's acquisition of DGH was a change in membership of DGH. See In re Albright, 291 B.R. 538, 540 (Bankr. D. Colo. 2003). In Albright, the bankruptcy court considered what interest the chapter 7 trustee obtained in an L.L.C. owned 100% by the debtor. The court held that under § 541(a)(1), upon the debtor's bankruptcy filing, the debtor "effectively transferred her membership interest [in the L.L.C.] to the estate." Albright, 291 B.R. at 540. Under this rationale, the Debtor transferred his interests in DGH to the Trustee upon the Court's determination that the Trust assets were property of the estate.

The corollary question is what legal effect, if any, did this change in membership have under the Operating Agreement? The agreement is clear that "transfer" includes a change in ownership of "entity" members, and that DGH is an entity member. The agreement is also clear that to be admitted as a member, an "assignee" must obtain the consent of all members. Under the Operating Agreement, however, an "assignee" is not defined to include a transferee of an entity member. Rather, it is limited to a "transferee of an interest in the Company," which is Kimball and Pioneer. The term "member" also refers only to "a holder or transferee of an interest in the Company who is an Assignee and not a Member." In this instance, there has been no transfer of an interest in the Company. DGH was and remains a member of Kimball and Pioneer. Accordingly, the plain language of the Operating Agreement does not restrict the transfer of ownership of an entity member.

This result appears consistent with cases both in- and outside of the bankruptcy context that have addressed the effect a transfer of the ownership of an "upstream" entity has on a

---

[4] The Operating Agreement provides that the laws of the State of Alaska govern. The Trustee does not dispute this.

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 7

**Below is a Memorandum Decision of the Court.**

"downstream" partnership interest. In <u>Elm Road Development Co. v. Buckeye Retirement Co., L.L.C. (In re Hake)</u>, 419 B.R. 328. 332 (6th Cir BAP 2009), the debtor owned a 100% interest in Randall J. Hake Contracting Corp. and 32% interest in Tuller Brookfield Associates, Inc., which respectively owned a 49% and 50% interest in Woodland Park Retirement Housing Limited Partnership. The Sixth Circuit Bankruptcy Appellate Panel considered whether the chapter 7 trustee's sale of the debtor's interests in Hake Contracting and Tuller violated the provision of the Woodland Park partnership agreement that prohibits transfers of limited partnership interests without general partner consent. <u>Hake</u>, 419 B.R. at 334. The court noted that while the Woodland Park partnership agreement expressly required partner consent for transfer of Woodland Park partnership interests, it was silent as to transfers of ownership interests in entities that were holders of Woodland Park partnership interests (referred to as "upstream" entities). <u>Hake</u>, 419 B.R. at 334. The court recognized that a split of authority exists as to whether the transfer of upstream ownership interests amounts to a transfer of the downstream partnership interest requiring consent. "The majority of courts find that such transfers do not require consent. Under this 'majority view,' transfer restrictions must expressly state that they apply to upstream entities. See, e.g., <u>United States Cellular Inv. Co. of Los Angeles, Inc. v. GTE Mobilnet, Inc.</u>, 281 F.3d 929, 935 (9th Cir. 2002); <u>Ne. Commc'ns of Wis., Inc. v. CenturyTel, Inc.</u>, 516 F.3d 608 (7th Cir. 2008); and <u>Engel v. Teleprompter Corp.</u>, 703 F.2d 127, 134-35 (5th Cir. 1983)." <u>Hake</u>, 419 B.R. at 334. The court further explained that "[s]ilence on the issue is presumed to indicate an intention by the parties not to restrict transfer of ownership of upstream entities," which is consistent with the public policy disfavoring restraint on alienation. <u>Hake</u>, 419 B.R. at 334. The court distinguished those cases that comprise the "minority view," primarily on grounds that the partnership agreements there were broad enough to apply, or specifically applied, to all direct and indirect transfers. <u>Hake</u>, 419 B.R. at 335 (citing <u>Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. P'ship</u>, 840 F. Supp. 770

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 8

(D. Oregon 1993), In re Asian Yard Partners & Asian Yard Venture Corp., 1995 WL 1781675 (Bankr. D. Del. 1995), and Nicolas M. Salgo Assoc. v. Continental Ill. Props., 532 F. Supp. 279 (D. D.C. 1981)).

In U.S. Cellular, the Ninth Circuit case cited by the Hake court in support of the majority view, a partnership agreement explicitly limited a general partner's right to transfer or assign its interests by requiring unanimous consent of all other partners, and granted each limited partner a right of first refusal before any other partner could transfer its limited partnership interest. U.S. Cellular, 281 F.3d at 932. AirTouch Cellular owned a majority of the partnership interest. The parent corporation of AirTouch sold all of the stock in its subsidiary AirTouch to an outside corporation. The plaintiff, who was a minority partner, alleged that the stock sale was a "transfer" that triggered the agreement's anti-transfer provisions. U.S. Cellular, 281 F.3d at 933. The Ninth Circuit rejected the plaintiff's argument because nothing in the limitations restricted the sale of stock of an owner of the partnership. U.S. Cellular, 281 F.3d at 935. The court distinguished Oregon RSA, 840 F. Supp. 770 (cited by the Hake court as a minority view), because the transfer in that case was done purely to avoid the right of first refusal clause. U.S. Cellular, 281 F.3d at 936. The Ninth Circuit recognized that AirTouch had existed and continued to exist after the sale of its stock as a genuine corporation conducting business. The circuit court noted that its holding might be different had the stock sale been to a shell entity merely for the purpose of avoiding the transfer restrictions. U.S. Cellular, 281 F.3d at 937.

In Northeast Communications, also cited by the Hake court in support of the majority view, the parent company of one of the members (Universal Cellular) of a limited partnership underwent a merger. Ne. Commc'ns, 516 F.3d at 610. The Seventh Circuit Court of Appeals (Seventh Circuit) considered whether the partnership agreement giving the partners a right of first refusal pertaining to transfers of partnership interests became activated by the merger.

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 9

Ne. Commc'ns, 516 F.3d at 608.  The Seventh Circuit addressed the plaintiff's argument that adhering to the majority rule frustrates a major purpose of partnership provisions, which is to give the original partners a right to keep strangers out of their business ventures.  Ne. Commc'ns, 516 F.3d at 611.  Rejecting the argument, the circuit court ruled, "Yet how does a change in its ownership structure make Universal Cellular a 'stranger' to the Partnership?  True, a new (indirect) owner may give Universal new marching orders, but so may a new CEO of a partner that has no corporate parent, and a change of CEO (or a new business plan adopted by an old CEO) does not give other partners a buyout right."  Ne. Commc'ns, 516 F.3d at 611.

The Fifth Circuit Court of Appeals (Fifth Circuit) reached a similar conclusion in Engel, also relied upon by the Hake court.  Engel, 703 F.2d at 134-35.  In that case, a stock subscription agreement in a corporation, El Paso Cablevision, Inc., provided that if a stockholder planned to sell or otherwise dispose of his shares, the other shareholders had a right of first refusal.  Engel, 703 F.2d at 128.  Through a series of complex transactions, some 75% of the shares in the corporation were owned by a corporate entity which, in turn, was sold and became a wholly owned subsidiary of a third corporation.  The parent corporation was subsequently acquired by a fourth corporation.  Engel, 703 F.2d at 128-30.  The minority shareholders of the first corporation claimed that this series of transactions entitled them to exercise their right of first refusal.  The Fifth Circuit found that none of these transactions constituted a sale or disposal of the first corporation's stock, noting that "transfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary."  Engel, 703 F.2d at 134.  Further, the "stock subscription agreement restricted transactions in El Paso stock alone; it did not restrict transactions in the stock of any other corporation."  Engel, 703 F.2d at 135.

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 10

**Below is a Memorandum Decision of the Court.**

The Court finds persuasive the majority analysis adopted by the Sixth Circuit Bankruptcy Appellate Court in Hake and employed by the Ninth, Fifth and Seventh Circuits. The Operating Agreement, while touching on the issue of upstream entity transfers, does not expressly restrict the transfer of ownership interests in upstream entities like DGH. Conversely, the plain language of the Operating Agreement explicitly requires member consent of a transferee of "an interest in the Company" in order for that transferee to become a member. This language indicates that the drafters of the Operating Agreement were aware of, and knew how to draft, language that restricts the transfer of membership interests. The Court will not read into the Operating Agreement that which the drafters excluded. See Engel, 703 F.3d at 134-35 (where the Fifth Circuit noted that "[n]either law nor equity favors our reading into the stock transfer restriction words which the parties to the agreement themselves did not write.")

Moreover, the current case is distinguishable from the minority view cases in that there is no evidence that DGH is a shell entity created merely for subterfuge. Nor is there evidence that the transfer of DGH from the Debtor to the Trustee was carried out to evade the reach of the anti-transfer provisions in the Operating Agreement. Furthermore, the Dreyers have cited no applicable state law disfavoring the majority view. Accordingly, the transfer of the Debtor's membership interest in DGH to the Trustee was not restricted by the Operating Agreement. The Court concludes that the Trustee succeeded to all of the Debtor's interests in Kimball and Pioneer, including management and voting rights, through DGH's 85% membership interest in these L.L.C.s.

The Dreyers also assert that the issue of what membership rights the Trustee acquired in Kimball and Pioneer is governed by § 365 rather than § 541, since the Operating Agreement is an executory contract. See First Protection, 440 B.R. at 830 (where the Ninth Circuit Bankruptcy Appellate Panel set forth the rule that if a limited liability company operating

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 11

**Below is a Memorandum Decision of the Court.**

agreement is an executory contract, § 365 governs a trustee's rights regarding its interests in a multi-member L.L.C. rather than § 541(c)(1)). Section 365(a) governs a trustee's assumption of "any executory contract . . . *of the debtor.*" § 365(a) (emphasis added). According to the Trustee, § 365 is not applicable because the Operating Agreement is not an executory contract of the Debtor, but rather of DGH and the Dreyers. The Dreyers reject this interpretation. Neither the Dreyers nor the Trustee cite any legal authority in support of their positions. The Court, however, is again bound by the plain language of the statute, which states that the executory contract must be "of the debtor." While it is undisputed that the Debtor had an interest in Kimball and Pioneer, this interest was indirect, through his ownership of DGH and DGH's majority ownership of the L.L.C.s. The Dreyers and DGH, not the Debtor, are parties to the Operating Agreement. As recognized by the Fifth Circuit in Engel, a parent corporation possesses a separate existence from a subsidiary. Engel, 703 F.2d at 134. Accordingly, based on the plain language of the statute, the Court concludes that § 365 does not govern the issue of what membership rights the Trustee has in Kimball and Pioneer.[5]

/// End of Memorandum Decision ///

---

[5] Having concluded that § 365 does not control, the Court need not reach the issue of whether the Operating Agreement is an executory contract. Nor does the Court need to apply the Catapult test under § 365(c)(1). In re Catapult Entm't, Inc., 165 F.3d 747, 754-55 (9th Cir. 1999).

MEMORANDUM DECISION ON DREYERS'
MOTION FOR SUMMARY JUDGMENT - 12